N442LaiS kjc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                             21 Cr. 343 (SHS)

5    LARRY LAI,

6                   Defendant.

7    ------------------------------x          Sentencing

8                                             April 4, 2023
                                              2:10 p.m.
9

10   Before:

11                     HON. SIDNEY H. STEIN,

12                                            District Judge

13

14
                              APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   BY:  JONATHAN L. BODANSKY
          Assistant United States Attorney
18

19   DAVID TOUGER
          Attorney for Defendant
20

21

22

23

24

25

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your names

3     for the record.

4          MR. BODANSKY:  Good afternoon, your Honor.  Jonathan

5     Bodansky for the government.

6          THE COURT:  Good afternoon.

7          MR. TOUGER:  Good afternoon, your Honor.  David

8     Touger, for Mr. Larry Lai, who is standing next to me.

9          THE COURT:  Please be seated.

10          Let me tell you what I have, gentlemen.  I have the

11     presentence report revised on March 27 of this year,

12     originally prepared on March 1, and it has a recommendation of

13     a total offense level of 19, criminal history category is I,

14     guideline range of 30 to 37 months, with a recommended

15     sentence of 366 days on the basis of a variance.

16          I have the submission of Mr. Touger, which is

17     Document 182, filed on March 21, 2023, and it is a lengthy

18     and somewhat repetitive but heartfelt submission by Mr. Touger,

19     and it attaches a letter of Mr. Lai.

20          I also have the submission of the government dated

21     March 28, which is ECF Document 190, in which the government

22     requests the Court impose a sentence within the adjusted

23     guideline range of 27 to 33 months.  I should say that

24     Mr. Touger is requesting no time, nonjail sentence.

25          Government, as I understand your submission,

1    apparently there is an agreement among the parties that a

2    variance is appropriate, a one-level variance, leading to an

3    adjusted guideline range of 27 to 33 months.  But the

4    government is not saying that that is the offense level.  I

5    take it the government is just saying they believe a one-level

6    variance is appropriate, bringing the guideline range of 30 to

7    37 months to a requested 27 to 33 months.  Am I correct?

8                 MR. BODANSKY:  That is correct.

9                 THE COURT:  In other words, the government's view

10   isn't that the guideline range is not 30 to 37.  There are too

11   many negatives there.

12                The government's position, I gather——and so is the

13   defendant's——is that the offense level is 19, the criminal

14   history category is I, and the guideline range is 30 to 37,

15   correct?

16                 MR. BODANSKY:  That's correct, your Honor.

17                 THE COURT:  And that's correct for Mr. Touger, also,

18   right?

19                 MR. TOUGER:  As far as do I agree that that is the

20   guideline level?

21                 THE COURT:  Yes.

22                 MR. TOUGER:  Yes.

23                 THE COURT:  Okay, fine.

24                In addition, I have a consent preliminary order of

25   forfeiture that I signed on January 5 of this year and I have

1  also been presented with an amended consent preliminary order

2  of forfeiture, and I am signing that now.

3          Is there any additional information I should have,

4  written information I should have, Mr. Touger?

5          MR. TOUGER:  No, your Honor.

6          THE COURT:  Government.

7          MR. BODANSKY:  No, your Honor.

8          THE COURT:  Mr. Touger, have you and Mr. Lai had a

9  full opportunity to read all of this information and have you

10 in fact read and discussed it with your client?

11         MR. TOUGER:  Yes, we have, your Honor.

12         THE COURT:  Do either you or he have any objections

13 to the findings of fact in the presentence report?

14         MR. TOUGER:  Not as it is today, no.

15         THE COURT:  Does the government?

16         MR. BODANSKY:  No, your Honor.

17         THE COURT:  I hereby adopt the findings of fact in

18 the presentence report.

19         All right.  Talk to me, Mr. Touger.  I agree with

20 your position that he is 71 years old, he is among the least

21 culpable here in this conspiracy, he was only in it for three

22 months, he does extensive charitable service at his temple

23 currently and he had no role in planning.

24         On the other hand, he has a significant prior federal

25 offense, trademark counterfeiting, for which he received a

1  break.  He was given probation.  And we are talking about ten

2  pickups in those three months for $970,000.  So it is not as

3  if this is extremely minor.

4          By the way, you keep on in your papers telling me how

5  minor his role is, but in the guideline range you don't

6  have -- there is no provision for minor role adjustment.

7          I take it your answer to that is, well, that's a

8  negotiated document.

9          MR. TOUGER:  It's a negotiated document and --

10          THE COURT:  Now speak to me because you want no time.

11  Speak to me about the things that I mentioned, trademark

12  counterfeiting conviction for which he was given a break

13  previously, only three months, but ten pickups for 975,000, in

14  other words, almost a million dollars, and if I understand the

15  government's submission, although it doesn't specifically

16  speak to Mr. Lai . . .

17          (Defense counsel and defendant confer)

18          THE COURT:  Apparently a code was worked out where he

19  had to give a particular serial number on a bill before the

20  pickup could take place, so he certainly knew mischief was

21  afoot, to put it mildly.  So what is the theory of no time

22  given those circumstances?

23          MR. TOUGER:  Certainly, your Honor.

24          So, first, let me deal with the ten pickups, because

25  there are two different types of activities.  For the majority

1   of those pickups, all Mr. Lai did was sit in his car outside

2   his apartment.  Somebody would drive up and give him a

3   package -- container of money, and then he would wait there

4   and another person would drive up and take that container of

5   money.  He was never paid for any of those activities.

6          THE COURT:  He didn't make any money.

7          MR. TOUGER:  Didn't make any money on those types of

8   transactions.  The only types of transactions he was paid for

9   were the three and he thinks it might be four times he went to

10  the bank and drove the individual to the bank who then went

11  into the bank on most of the occasions and made the deposit

12  and came out, and he would drive him back.  Those are the ones

13  he got paid a few hundred dollars for on each one, depending on

14  how much money was being deposited.

15         So as far as the money earned, between everything, he

16  probably earned less than a thousand dollars or just slightly

17  around a thousand dollars for all of his activities, compared

18  to the 975,000 he was involved in and I think it was --

19         THE COURT:  Say that again.  I'm sorry.  What --

20         MR. TOUGER:  Compared to the --

21         THE COURT:  No, beforehand.

22         MR. TOUGER:  He totally earned, if you add up

23  everything he earned, it came to approximately a thousand

24  dollars for everything that he did, compared to the 975 he was

25  involved in and of course the 14 million that the conspiracy

1    was involved in.

2          So there is no doubt that he is -- I don't know if

3    there are other people like Mr. Lai in other cities or not.  I

4    don't know the answer to that question.  But no nobody could

5    be lower on the totem pole than him.  There might be others as

6    low as him, but nobody could be lower on the totem pole.

7          So as far as the prior record, somebody came into his

8    store selling -- saying if he wanted to buy cigarettes to sell.

9    He bought the cigarettes to sell.  He didn't realize they had

10   to have stamps on them, and that's why he got probation as

11   opposed to any jail time, because it was more out of ignorance

12   than criminal offense.

13         The other reasons, though, your Honor, is beside that

14   activity, Mr. Lai leads what I would say is a very frugal but

15   happy existence.  He basically lives in his one-room apartment

16   that's divided up into a kitchen, bedroom, and living room,

17   but basically a one-room basement apartment.  He spends most

18   of his day every day going to his local temple, volunteering

19   there, helping people who are not bilingual do translations.

20   He is also a custodian there, cleaning up from there.  And

21   basically that temple could not survive without his activity.

22   He is one of two or three people that really keep that temple

23   going for the rest of the community.

24         The other situation, your Honor, that is just a

25   recent development that we certainly didn't even know a month

1    ago, but now we know is that his wife, as you have seen in the

2    PSR, is a lung cancer survivor.  Basically three-quarters of

3    her lung was taken out from lung cancer.  She was found in

4    stage 3.  Some doctors said it was stage 4.  But three quarters

5    of her lung was removed.  And just recently her thyroid has

6    been shown to have three nodules on it, and they are going in

7    two weeks for an appointment to do a biopsy to see if there is

8    cancer, she has thyroid cancer.

9         Mr. Lai spends the part of his day that he is not

10   volunteering at the church with his wife, basically taking

11   care of his wife, and it would be a major hardship for his

12   wife if he would be sent to jail, especially at this time

13   where it looks like, unfortunately, she might be suffering a

14   relapse of a type of cancer.

15        THE COURT:  Why do you say that?  You just said there

16   are nodules on her thyroid but the biopsy has not been done.

17        MR. TOUGER:  Right.  I said where she might be facing.

18   I don't know if she is or is not.

19        The other is, your Honor, is that -- look, I have

20   been practicing law for 38 years.

21        THE COURT:  You tell me that every year.

22        MR. TOUGER:  It goes up every year.

23        THE COURT:  You add a year on periodically.

24        MR. TOUGER:  Right.  Now I am up to 38 1/2, and I

25   have met some people who are criminals and some people who

1  have criminal instincts and then we have met some people who

2  sort of fall into criminal activity like Mr. Lai.  Mr. Lai

3  would not have been here if he was not approached by a friend

4  of his who said, you know, I know you need some money because

5  of all that's going on in your life.  These guys will pay you

6  just for driving them around, and he does that and then

7  once -- he didn't know at that point that it was going to be

8  illegal activity.  The friend certainly doesn't come up to him

9  and say, hey, I'm involved in this illegal activity and I need

10 you to help these guys out.  He doesn't know he was involved

11 in it.  But once he was in it, he was too fearful to get out.

12 Was that a mistake?  Obviously yes.  Should he have tried to

13 get out?  Obviously yes.  But fear does weird things to

14 everybody's mind, and he was fearful of what could happen to

15 him and/or his wife or other people that he knows.

16        So I don't think a jail sentence is necessary to send

17 Mr. Lai a message not to do this again, because I don't think

18 he ever will do this again because he never would have --

19        THE COURT:  What about general deterrence?

20        MR. TOUGER:  General deterrence is a very funny,

21 weird thing that we always have to deal with.  I think it has

22 to be -- general deterrence has to be countered by is this a

23 famous crime or a not-famous crime?  Because the public

24 doesn't know about Mr. Lai, your Honor.  Nobody knows Mr. Lai

25 is here today getting sentenced by your Honor for this crime.

1  Nobody knows.  It's not going to have any impact on anybody

2  out in the world right now considering whether to do criminal

3  activity or not.  It's just not.  To argue otherwise I think

4  is just unfounded.  There is no way that if the Court finds

5  that someone who is 71 years old, with a very minor criminal

6  record that happened over a decade ago, who lives the

7  lifestyle that Mr. Lai lives and who volunteers the way he

8  does in his community and is the type of person he is, got a

9  probation sentence for his small——and I still say small——role

10  in this criminal activity, I don't think anybody in the public

11  would be upset about that.  I don't think anybody in the

12  public would go, oh, I can get away with the crime.  I will go

13  and do it.  So I don't think there is any general deterrence

14  about this sentence of giving him a nonjail sentence.

15  However, I do think that if it was brought out into

16  the public, the public really was paying attention to this and

17  this Court sentenced Mr. Lai even to a year and a day in jail,

18  that there are a lot of people who would say why?  What is that

19  doing except wasting $45,000 of taxpayer money to put him in

20  jail?  I think there would be many people who would make that

21  argument.

22  So I don't think there is any general deterrence to

23  be gained by this case, and I think there is no civic

24  deterrence reasoning for putting Mr. Lai in jail.

25  THE COURT:  All right.  Thank you.

1       Government, what would you like to tell me?

2       MR. BODANSKY:  Just a couple of points, your Honor.

3       First, with respect to the prior conviction, I don't

4  have any information beyond what's in the PSR, but I would

5  note that, as reflected in the PSR, the prior conviction is a

6  little more serious than as suggested by defense counsel.  It

7  does reference that the organization that he was a part of

8  also engaged in burglaries of other entities involved in the

9  same sort of activity.  It states that this defendant was

10 tangentially involved in that.  So I don't know the full

11 extent of his involvement in that, but I think the criminal

12 activity being discussed in that prior conviction is a little

13 bit more serious than simply selling cigarettes without the

14 proper trademarks.

15       In a similar vein, I would also note that the

16 defendant's involvement in this offense is also a little

17 broader than referenced by defense counsel.  As reflected in

18 the PSR and the government's submission, in addition to the

19 money pickups and the dropoffs with the financial institution,

20 the defendant also aggregated funds at his home for

21 redistribution to other members of the organization.  So a

22 couple points of clarification there.

23       Beyond that, the government agrees with the factors

24 being balanced by your Honor.  It largely doesn't disagree

25 with many of the mitigating factors referenced by the defense.

1   The government agrees this is one of the lesser culpable

2   members of the organization.  He is obviously elderly.  Beyond

3   that one conviction, he doesn't have a criminal history beyond

4   that.

5         That said, this is serious conduct, as your Honor

6   pointed out, which was not one or two instances of involvement

7   in this, it was ten, it was large sums of money, and this sort

8   of activity is serious.  As noted in the government's papers,

9   this money laundering organization was laundering money for a

10  drug-trafficking organizations and those sorts of money

11  laundering activities are important to the ability of those

12  drug-trafficking organizations continuing.

13        I will note the government has not alleged that the

14  defendant was specifically aware that these funds were coming

15  from drug trafficking activity.  The government does allege

16  that the defendant was aware it was from criminal activity but

17  not necessarily that he knew specifically that it was drug

18  trafficking activity.

19        If the Court has any questions I am certainly happy

20  to address them but --

21        THE COURT:  What about Mr. Touger's point of general

22  deterrence, that is, nobody will know or care—except Mr. Lai,

23  obviously, and his family—about the results of today's

24  sentencing.

25        MR. BODANSKY:  The point is well taken.  I understand

1  that this is not a famous case that's probably not going to be

2  specifically focused on by the public.  That sort of argument

3  can be made in a vast number of cases, but I think there is

4  still the case that as a general matter, over time, these

5  sorts of -- the patterns of sentencing in these sorts of

6  activities are things that people are aware of.  I think the

7  public is generally aware of the kinds of sentences that

8  people involved in money laundering could be expected to

9  receive.  But that is a more generalized argument.  I can't

10  counter that anyone is paying attention at this moment to this

11  particular proceeding.

12          THE COURT:  All right.  Thank you.  Mr. Lai, you have

13  the right --

14          MR. TOUGER:  Your Honor, can I just respond to a

15  couple of points?

16          THE COURT:  Yes.

17          MR. TOUGER:  First of all, your Honor, Mr. Lai -- it's

18  "lay," by the way.

19          MR. BODANSKY:  My apologies.

20          THE COURT:  "Lay."

21          MR. TOUGER:  Mr. Lai vehemently denies that he ever

22  took money into his house or aggregated sums of money.  He does

23  agree he was outside his house, got money delivered, waited in

24  his car, somebody else came and got that money.

25          The idea that he knew it was drug money is beyond.

1    That's just not true.  He knew it was illegal money because

2    it was just so large.  And if it was legal money, why would

3    they be delivering $200,000 in cash?  He is not sticking his

4    head in the sand and saying I didn't know.

5            The other thing, your Honor, is as far as general

6    deterrence is concerned, if this was a case where -- what we

7    see in a lot of cases in this court, where a bunch of

8    individuals from a certain neighborhood are arrested for drug

9    dealing and we know that those neighborhoods are full of drug

10   dealers and the Court gives somebody a probationary sentence

11   and that person then he goes back on the street corner and

12   everybody goes, hey, this is the argument the government

13   always uses, hey, Joe Smith got away with drug dealing, why

14   can't I do it?  That's one argument that I still think is weak

15   as far as general deterrence, but it has a logical

16   transference of knowledge and of deterrence if Joe Smith

17   doesn't show back up on the street corner and goes to jail.

18   Here that's not the situation.  Nobody knows of Mr. Lai's

19   arrest at all, nobody in his neighborhood.  They did not want

20   this put out into public knowledge.  Nobody that he knows

21   does.  His own stepdaughter he only told recently.

22           THE COURT:  That may have worked the other way,

23   though.  That may counsel, if he is sentenced to jail, people

24   will know about it, so that there will be a general deterrent

25   effect.

1    MR. TOUGER:  Among who?  Who is going to find out?  I

2  understand the Court's question, but among who?  The people

3  who are laundering the money certainly aren't going to get

4  time served from this Court, I would assume.  So they are not

5  going back and going, oh, the guy who was just a donkey got

6  time served, so therefore I can launder $200,000 in drug

7  money.  That's not going to happen.  The donkeys out there will

8  never know because they are never told what they are doing.

9  That's why they wouldn't get involved.  If you went up to

10  Mr. Lai beforehand and said, Mr. Lai, I need you to drive --

11  I'm going to pay you $300 to $500 to drive me to a bank to

12  launder drug money, Mr. Lai never would have done it, and

13  that's the difference in what your Honor is saying is.  The

14  drug dealers and the money launderers who know they are

15  laundering money have decided to get involved in criminal

16  activity to make money.  Mr. Lai didn't and wouldn't have and

17  therein lies the difference, your Honor.

18    THE COURT:  Thank you.

19    Mr. Lai, you have the right to address the Court.  You

20  don't have to say anything, sir, and I do wish to inform you

21  that anything you say may be used against you.  If you want to

22  address me, now is your opportunity.

23    THE DEFENDANT:  This is -- my name is Larry, of

24  course, and the reason why I was hooked up into this situation

25  is because when I went on to vacation in California and a

1  friend asked me, I have a friend that will need your help, if

2  possible. And I said what kind of help? And he said, well,

3  it is just driving the peoples to the bank, and maybe if you

4  can pick up when they drop off the money to your car and then

5  somebody will pick it up.

6          I said okay, but how much do I get paid if I do drive

7  them to the bank? And they say, well, it's like $300 if it's

8  close by.

9          And I said how much is the deposit? Originally in

10 the very beginning I did not know how much was the deposit.

11 And then as soon as I got into the bank, the first time it was

12 Chase Bank on Main Street. The deposit, when the guy came in

13 with the money, with a bag of money, and they say it was like

14 $240,000, I said: Where did you get the money from? He say:

15 I have a business in the buffet restaurant. And I think to

16 myself, if the guy can bring $240,000 and deposit in the bank,

17 that's nothing wrong with it because it's not drug money.

18 Because if it's a drug money, he would not dare to go to the

19 bank and make a deposit. So the first time I drove him there.

20         Then maybe a week later, then I have to deposit

21 another -- I don't even know how much, this time Bank of

22 America, also on Main Street, right across the street. He

23 didn't tell me how much.

24         And then the next one was making another deposit, and

25 I realize, I say, okay, how come you got so much money all the

1    time?  And I'm trying to pull myself out of this.  And the way

2    that he look at me is kind of strange.  Why are you bailing

3    out?  And I say, well, there's got to be something illegal.  If

4    it's not illegal, why would I bring -- if it's not legal, why

5    would I bring the money to the bank?  There is obviously no

6    problem.

7          So I still wanted to get out, but kind of -- it was

8    kind of hard for me to get out because it is like -- he looks

9    so -- the way that he looked at me was, like, you know, you

10   know some of the stuff that I am doing.  So from that time on,

11   I kind of relaxed myself and I say no, no more driving around,

12   and that was it.  And I realized it must be illegal money, and

13   I will not take them to the bank anymore.

14         THE COURT:  But you did ten pickups in three months.

15         THE DEFENDANT:  That was not a pickup.  It was

16   dropoff in my car, in front of my house, and someone pick it

17   up from my house -- not my house, the car outside, and I don't

18   even know how much money, because I don't even touch the

19   money.

20         THE COURT:  So why did you do this?

21         THE DEFENDANT:  Well, in the beginning because I live

22   in a basement apartment with my wife and our only income was

23   Social Security, and even though I live rent free from my

24   daughter's place and we need the money more than -- my wife

25   got paid $650 on Social Security in the beginning and I got

1  like a thousand. I forgot what the amount is. But right now

2  I am getting 1399. And so any little extra help would help

3  me. That's the way that I was thinking. But then it was a

4  wrong and a stupid way of making money.

5          THE COURT: All right. Thank you.

6          THE DEFENDANT: I realized I was wrong.

7          THE COURT: Not only were you wrong, you were

8  engaging in criminal and unlawful activity. Do you know that?

9          THE DEFENDANT: After the third time to the bank, I

10  realized I was wrong and I realized it was criminal. In the

11  beginning, no, because if he has the business that can deposit

12  that much money that's in the bank, there is obviously no

13  problem with it. Because I myself, if I have that much money,

14  if I deposit $10,000 I need to sign an IRS form. So obviously

15  when he deposit the money, he obviously did sign the IRS form.

16  So that's -- but I didn't go into the bank with them, so I

17  don't know whether they filed the IRS or not.

18          THE COURT: All right. Thank you.

19          I'm really not sure what the correct thing to do here

20  is. The crime just can't be brushed off. In fact, what

21  Mr. Lai has been telling me is, in effect, he was just making

22  excuses as it went along because he had some sense that

23  something was wrong and just continued on it because of a look

24  from the man. So that doesn't helping Mr. Lai's case.

25          THE DEFENDANT: Excuse me. I did stop after the

1    third time.  I did stop.

2           THE COURT:  Thank you.

3           On the other hand, I really don't know what's to be

4    served by sending him to prison.  He lives a very peaceful,

5    law-abiding existence, taking care of his wife and

6    volunteering at his temple.  I don't think it will do anything

7    to incarcerate him.

8           So I'm going to adopt the recommendation of the

9    defense here.  I am giving a substantial variance.  I am

10   sentencing this defendant to time served and a year of

11   supervised release.

12          The reason for the variance, which is a substantial

13   variance, is the defendant's age, the fact that he is among

14   the least culpable of the defendants and probably the least

15   culpable, the short period of time he was involved in the

16   conspiracy, which is only three months, his charitable service

17   at his temple, and the fact that he had no role in planning.

18   That is my sentence.  It will be my sentence.

19          Mr. Lai, I am going to ask you to stand.

20          Before I formally impose sentence, is there any

21   objection that the defense wishes to lodge?

22          MR. TOUGER:  No, your Honor.

23          THE COURT:  Government?

24          MR. BODANSKY:  No, your Honor.

25          THE COURT:  I believe I have already adopted the

1    finding of fact in the presentence report.  If I haven't, I do

2    so now.

3            I hereby find that the guideline range is 30 to 37

4    months, the offense level is 19, the criminal history category

5    is I.

6            Pursuant to the Sentencing Reform Act of 1984, it is

7    the judgment of this Court that the defendant, Larry Lai, is

8    sentenced to time served.  Mr. Lai shall be placed on

9    supervised release for a term of one year with the conditions

10   recommended by the probation department, namely, the mandatory

11   conditions set forth on page 25, except I am waiving the

12   mandatory drug testing requirement on the finding that Mr. Lai

13   is highly unlikely to abuse drugs or alcohol.

14           In addition to the mandatory conditions set forth on

15   page 25, I am sentencing him to serve his one year of

16   supervised release with the standard conditions 1 through 12

17   set forth on page 25 and 26 of the presentence report and the

18   special condition of search condition as set forth on page 27

19   of the presentence report.

20           Mr. Lai shall report in person to the probation

21   office in the Southern District of New York within 72 hours of

22   the entry of judgment papers in this case, and my intention is

23   to enter the judgment within a day or two.

24           I am not imposing a fine because I find Mr. Lai lacks

25   the ability to pay a fine after taking into account the

N442LaiS kjc

1  presentence report and his lack of assets, his modest income,

2  and his family responsibilities, as well as his limited

3  earning ability.

4         I am not imposing restitution because there is no

5  victim pursuant to 18 U.S.C. 3663.

6         I have imposed an amended consent preliminary order

7  of forfeiture on the term set forth there.  Mr. Lai is jointly

8  and severally liable with codefendant Ying Sun, and the

9  forfeiture is a sum of money of $975,000.

10        Mr. Lai shall pay to the United States a special

11 assessment of $100 which is due immediately.

12        I have sentenced this defendant on a downward

13 variance from the guideline range for the reasons I have set

14 forth, that is, his age, the fact that he is among the least

15 culpable, if not the least culpable of the codefendants, the

16 limited period of time in which he participated in the

17 conspiracy, the fact that he had no role in planning, and the

18 fact of his charitable service at his temple.

19        Mr. Touger, are you aware of any legal reason why the

20 sentence should not be imposed as I have stated it?

21        MR. TOUGER:  No, your Honor.

22        THE COURT:  Government?

23        MR. BODANSKY:  No, your Honor.

24        THE COURT:  I hereby order the sentence to be imposed

25 as I have stated it.

1          Mr. Lai, you have the right to appeal the sentence I

2     just imposed on you and if you cannot pay the cost of an

3     appeal, you have the right to apply for leave to apply *in*

4     *forma pauperis*.  I also wish to inform you that in your plea

5     agreement you agreed to waive the right to appeal the sentence

6     and you agreed to waive the right to collaterally attack the

7     sentence if I sentenced you to 37 months or below, and indeed

8     I have done that because I have sentenced you to time served.

9          Mr. Touger, are you aware of any legal reason why

10    this sentence should not be imposed as I have stated it?

11          MR. TOUGER:  No, your Honor.

12          THE COURT:  Government?

13          MR. BODANSKY:  No, your Honor.

14          THE COURT:  I hereby order the sentence to be imposed

15    as stated.

16          And as I have said, you have the right to appeal the

17    sentence, and if you cannot pay the cost of an appeal, you

18    have the right to apply for leave to appeal *in forma pauperis*.

19    And I explained the limited waiver of appeal rights that you

20    entered into.  If you make a request, the Clerk of Court will

21    prepare and file a notice of appeal on your behalf immediately.

22          Do you understand your appeal rights, sir?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Government, are there any open counts

25    here?

1    MR. BODANSKY:  Yes, your Honor.  The government moves

2    to dismiss Count One of the indictment.

3         THE COURT:  All right.  Granted.

4         Mr. Lai, I have given you a substantial break here.

5    The government wanted you to be incarcerated for a

6    considerable period of time.  I agree with Mr. Touger that I

7    don't think that is necessary.  But you are going to be on

8    supervised release for a year.  Please don't commit any other

9    crimes either while you are on supervised release or any other

10   time because you are -- you now have two federal felonies on

11   your record and your guideline range will undoubtedly be

12   elevated by virtue of your criminal history category, and it

13   just doesn't make sense for you to commit another crime.

14        I take it you agree with me.

15        THE DEFENDANT:  Yes, your Honor.  I will never, ever

16   going to do any of those stupid activity anymore.

17        THE COURT:  All right.

18        THE DEFENDANT:  I will do my best to go to the temple

19   every day.

20        THE COURT:  Okay.  Take care of your wife.  Take care

21   of your charitable activities.  Stay out of trouble.  You will

22   be fine.

23        Anything else, Mr. Touger?

24        MR. TOUGER:  Yes, your Honor.  Mr. Lai has a sister

25   church of his temple in Taiwan, and they are having a 65th

1  anniversary celebration at the end of this month.  I was

2  wondering if the Court would allow for international trips.

3  Even when you are on supervised release you need –- he needs

4  Court approval for that trip, and I was wondering if the Court

5  would allow him to take that trip.  I, of course, would give

6  the dates, flights, places he will stay to his supervising

7  officer before he flies, but if the Court would allow him to

8  make that trip.

9  THE COURT:  What's the position of the government?

10  MR. BODANSKY:  The government would defer to the

11  judgment of probation on that.

12  THE COURT:  Yes, as will I.  Run it by probation.  Run

13  it by the probation department.  Make the application to me.

14  MR. TOUGER:  Thank you, your Honor.

15  THE COURT:  Thank you all.

16  THE DEFENDANT:  Thank you.

17  MR. BODANSKY:  Thank you, your Honor.

18  oOo

19

20

21

22

23

24

25